UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ARCTIC SOLE SEAFOODS,<br><br>           Plaintiff,<br><br>   v.<br><br>CARLOS M. GUTIERREZ,<br><br>           Defendant. | Case No. C07-1676MJP<br><br>ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT |

This matter comes before the Court on the parties' cross-motions for summary judgment. (Dkt. Nos. 7 & 24.) Having considered the motions, responses, and the relevant portions of the administrative record, and having heard oral argument on these issues, the Court GRANTS Plaintiff's motion for summary judgment and DENIES Defendant's cross-motion.

**Background**

This case involves amendments to the Fishery Management Plan for groundfish in the Bering Sea and Aleutian Island management area. In separate amendments to the Magnuson-Stevens Fishery Conservation and Management Act ("Magnuson-Stevens Act" or "Act"), 16 U.S.C. § 1801 et seq., Congress established eligibility criteria for four catcher processor subsectors in the Bering Sea Aleutian Islands ("BSAI") management area. In 2007, in a regulation entitled "Amendment 80," the National Marine Fisheries Service ("NMFS") interpreted Congress' criteria to limit eligibility in the non-AFA trawl catcher processor subsector to certain qualified vessels. NMFS did not include in its regulations a replacement vessel provision, i.e. a provision by which otherwise qualified owners could use a different vessel to participate in the fishery.

ORDER – 1

The ARCTIC ROSE, owned by Plaintiff Arctic Sole Seafoods ("Arctic Sole"), is specifically listed as a qualifying vessel in Amendment 80. 50 C.F.R. 679, Table 31. However, the ARCTIC ROSE sank in the Bering Sea on April 2, 2001, and has never been recovered. (Olney Decl. ¶ 5.) Arctic Sole purchased the OCEAN CAPE and transferred the LLP ("License Limitation Program") license from the ARCTIC ROSE to the OCEAN CAPE. (Id. ¶ 6.) Arctic Sole wishes to fish in the BSAI non-pollock groundfish fishery using the OCEAN CAPE, but cannot do so under the Amendment 80 regulations.

Arctic Sole has sued Carlos M. Gutierrez, in his official capacity as the Secretary of Commerce, alleging that the NMFS rule impermissibly restricts participation in the BSAI fishery to qualifying vessels. The parties have cross-moved for summary judgment on this issue and agree that this case will be decided on these briefs.

**Discussion**

**I.    Legal Framework**

   **A.    Capacity Reduction Plan & Amendment 80**

The Magnuson-Stevens Act created a national program for the conservation and management of fishery resources. 16 U.S.C. § 1801; Yakutat, Inc. v. Gutierrez, 407 F.3d 1054, 1058 (9th Cir. 2005). The Act provides the Secretary of Commerce, acting through NMFS and eight regional fishery management councils, the authority to regulate domestic fisheries where necessary and appropriate. 16 U.S.C. §§ 1811(a) & 1852(a). The Act authorizes development of federal fishery management plans and plan amendments, which are prepared by the regional councils and submitted to NMFS for review. 16 U.S.C. §§ 1852(h) & 1854(a). The BSAI fishery is managed by the Bering Sea/Aleutian Islands Groundfish Fishery Management Plan ("the Plan"). The Plan was developed by the Northern Pacific Fishery Management Council ("the Council") and is implemented by NMFS.

One of the many goals of the Magnuson-Stevens Act is "minimiz[ing] bycatch and avoid[ing] unnecessary waste of fish." 16 U.S.C. § 1801(c)(3). "Bycatch" is the "practice of discarding fish overboard from a fishing boat when, for example, a boat catches more fish than

ORDER – 2

permitted under its quota. Discarded fish often do not survive the trauma associated with being pulled from the depths of the ocean only to be thrown back in." Yakutat, 407 F.3d at 1059 n.3.

In 2004, as part of the Consolidated Appropriations Act of 2005, Congress amended the Magnuson-Stevens Act. Act of Dec. 8, 2004, Pub. L. No. 108-447, 118 Stat. 2809, § 219 [hereinafter Pub. L. 108-447, § 219]. The amendments created the Bearing Sea Aleutian Island Catcher Processor Capacity Reduction Program ("Capacity Reduction Program"), an attempt to promote stability of the fishery by "reduc[ing] excess harvesting capacity" from the catcher processor sector of the non-pollock groundfish fishery. See id.; see also 150 Cong. Rec. S11747-04, 11748, 2004 WL 2642449 (daily ed. Nov. 20, 2004) (comments of Senator Murray). The Capacity Reduction Program put in place a program for reducing the number of vessels and licenses. Pub. L. 108-447, § 219(d) & (e)(1).

The Capacity Reduction Program sets out eligibility criteria for participation in the BSAI fishery. First, "[o]nly a member of a catcher processor subsector may participate in ... the catcher processor sector of the BSAI non-pollock groundfish fishery." Pub. L. 108-447, § 219(g)(1)(A). Subsection 219(a)(3)(C) defines "catcher processor subsector" to include, among others, the "non-AFA [(American Fisheries Act)] trawl catcher processor subsector." "Non-AFA trawl catcher processor subsector" is in turn defined as:

the owner of each trawl catcher processor —

(A) that is not an AFA trawl catcher processor;
(B) to whom a valid LLP license that is endorsed for Bering Sea or Aleutian Islands trawl catcher processor fishing activity has been issued; and
(C) that the Secretary determines has harvested with trawl gear and processed not less than a total of 150 metric tons of non-pollock groundfish during the period January 1, 1997 through December 31, 2002.

Pub. L. 108-447, § 219(a)(7).

In June 2006, the Council recommended an amendment — Amendment 80 — to the BSAI Plan. In developing Amendment 80, the Council sought legal advice from counsel for the National Oceanic and Atmospheric Administration ("NOAA"). (Administrative Record ("AR") 134a.) The Council submitted Amendment 80 for review by the Secretary of Commerce in April

ORDER – 3

1   2007. On May 30, 2007, NMFS published a proposed rule to implement Amendment 80.

2   Fisheries of the Exclusive Economic Zone of Alaska, 72 Fed. Reg. 30,052 (May 30, 2007). The

3   proposed rule was approved (with few changes) and NMFS issued a final rule. Fisheries of the

4   Exclusive Economic Zone of Alaska, 72 Fed. Reg. 52,668 (Sept. 14, 2007). Among other things,

5   the final rule allocates several BSAI non-pollock groundfish species among trawl fishery sectors

6   and facilitates the formation of harvesting cooperatives in the non-AFA trawl catcher/processor

7   sector. Id. As stated in the final rule, "the Council adopted [Amendment 80] to meet the broad

8   goals of (1) improving retention and utilization of fishery resources; (2) allocating fishery

9   resources among BSAI trawl harvesters; (3) establishing a LAPP [("Limited Access Privilege

10  Program")] for the non-AFA trawl catcher/processors; and (4) limiting the ability of non-AFA

11  trawl catcher/processors to expand their harvesting capacity into other fisheries not managed

12  under a LAPP." Id. at 52,671. These goals were intended to support the larger goals of reducing

13  bycatch and improving utilization of fish resources "in order to provide the maximum benefit to

14  present and future generations of fishermen, associated fishing industry sectors, communities, and

15  the Nation as a whole." Id. at 52,668.

16        The proposed rule, like the final rule, limited participation in the Amendment 80 fishery to

17  particular vessels. 72 Fed. Reg. at 30,055. Arctic Sole commented on the proposed rule. Arctic

18  Sole's comment and NMFS' response is as follows:

19      *Comment 23*: For no discernable reason, replacement vessel provisions are absent
    from the proposed rule. This is a serious omission that was not addressed or explained
20  anywhere in the proposed rule even though Section 1.11.13.4 in the draft
    EA/RIR/IRFA assumes that replacement vessels will be allowed. There is no
21  explanation for the rationale of such a drastic and unprecedented step.

22      NMFS has indicated that section 219(a)(7) of the CRP limits the vessels that can
    participate in the Amendment 80 sector. NMFS has incorrectly interpreted this
23  provision of the CRP. Section 219 of the CRP should not be interpreted to create a
    defined class of vessels. Had Congress wished to limit participation by a group of
24  vessels, they would have used the same language as was used in the AFA. A clear
    distinction needs to be made between qualifying participants, which is what the CRP
25  [("Capacity Reduction Program")] addresses, and the vessels used to qualify.

26      *Response*: The proposed rule does not address, or create provisions for replacement
    vessels in the event an Amendment 80 vessel suffers an actual total loss or
27  constructive total loss, because Congress did not provide for such a provision in the
    CRP. The preamble to the proposed rule clearly describes the criteria that Congress
28

ORDER – 4

established for allowing a person to fish in the Amendment 80 sector under the CRP (72 FR 30057). In addition, NOAA General Counsel provided a series of memoranda to guide the Council in the development of the Program that specifically address this issue. Those memoranda are appended to the final EA/RIR/FRFA prepared for this action (see ADDRESSES).

The criteria to participate in the Amendment 80 sector are clearly established in the CRP. For purposes of participation in the catcher/processor sector of the BSAI non-pollock groundfish fishery, section 219(a)(7) of the CRP states:

(7) Non-AFA Trawl Catcher Processor Subsector.--The term "non-AFA trawl catcher processor subsector" means the owner of each trawl catcher processor--

(A) That is not an AFA trawl catcher processor;

(B) To whom a valid LLP license that is endorsed for Bering Sea or Aleutian Islands trawl catcher processor fishing activity has been issued; and

(C) That the Secretary determines has harvested with trawl gear and processed not less than a total of 150 metric tons of non-pollock groundfish during the period January 1, 1997 through December 31, 2002.

It is quite clear from the language used in the definition of the non-AFA trawl catcher/processor subsector (i.e., Amendment 80 sector) that there are three criteria for eligibility in the sector. Additionally, it is clear from the language used that all the criteria must be met by the owner of a trawl catcher/processor in order to be eligible for the Amendment 80 sector given Congress' use of the word "and" at the end of subsection 219(a)(7)(B).

The statutory language used in § 219(a)(7) or in other sections of the CRP does not include words that permit the Council or NMFS to amend Congress' enumerated qualification criteria. Additionally, there is no statutory language in § 219(a)(7) or elsewhere in the CRP that would permit the application of more restrictive, or more lenient, qualification criteria by the Council or NMFS. Congress did not provide the Council or NMFS with any ability to make adjustments to the specific statutory criteria addressing eligibility in the Amendment 80 sector. The criteria as to who is eligible to be a member of the Amendment 80 sector has been decided by Congress, and the Council and NMFS cannot select or impose different eligibility requirements for entrance to the Amendment 80 sector.

Persons who are eligible to participate in the Amendment 80 sector are those persons who, at the time of participation, own a trawl catcher/processor that meets the statutory criteria at § 219(a)(7)(A) and (C), and who has [sic] been issued a valid LLP license is [sic] endorsed for Bering Sea or Aleutian Islands trawl catcher/processor fishing activity for the trawl catcher/processor that meets the criteria in § 219(a)(7)(A) and (C). The criteria for trawl catcher/processors at § 219(a)(7)(A) and (C) will qualify a finite number of vessels for the Amendment 80 sector.

NOAA provided the Council and the public with a review of the CRP that addressed the inability for vessels not meeting the criteria of the CRP to be used to participate in the fishery. The Council clearly understood that no vessels other than those that meet the criteria established in the CRP could be used to fish in the Amendment 80 sector and that there was not a provision in the CRP to allow vessels not meeting the criteria established by Congress to replace those that did.

ORDER – 5

> Throughout the draft EA/RIR/IRFA the terms "qualified vessel" or "eligible vessel" are used to describe the 28 vessels that have been identified in Table 31 to Part 679 that meet the criteria established in sections 219(a)(7)(A) and (C) of the CRP. Other than Section 1.11.13.4 of the draft EA/RIR/IRFA, there is no suggestion that any vessels other than the 28 defined "qualified vessels" or "eligible vessels" could be used to fish in the Amendment 80 sector. Section 1.11.13.4 in the draft EA/RIR/IRFA prepared for the proposed rule is misleading and has been corrected in the final EA/RIR/FRFA to make it clear that this section does not describe the potential use of replacement vessels to fish in the Amendment 80 sector.
>
> Section 1.11.13.4 is intended to describe the requirement that Amendment 80 vessel holders must meet any time a person designates a vessel on an LLP license if that vessel wasn't previously designated on that LLP license. Specifically, this section notes that the existing maximum length overall (MLOA) requirements of the LLP license continue to apply to any vessel designated on an LLP license. The use of the term "replacement vessel" is intended to refer to a vessel that is newly designated on an LLP license. Although the use of this term may have caused confusion, this section does not describe a process for replacing an Amendment 80 vessel. NMFS has revised this section of the analysis to make it clear that it is intended to describe the use of LLP licenses on specific vessels, and not to suggest that vessels other than those vessels meeting the clear criteria established by Congress in sections 219(a)(7)(A) and (C) of the CRP can participate in the Amendment 80 sector. NMFS did not modify the regulations based on this comment.

72 Fed. Reg. at 52,689-90. The final rule mirrored the proposed rule in that it did not provide a replacement vessel provision and limited participation in the subsector to qualifying vessels. See 50 C.F.R. 679.7(o). The final rule did include, however, a provision allowing owners of lost Amendment 80 vessels to use the catch history of the lost vessels to apply to participate in the Amendment 80 cooperative. 50 C.F.R. 679.90(a)(2)(ii), 679.91(h).

**B.    APA Review**

The Magnuson-Stevens Act provides that judicial review of agency action taken pursuant to the Act is subject to judicial review under § 706 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 501 et seq. 16 U.S.C. § 1855(f)(1). That section of the APA provides that a reviewing court shall hold unlawful and set aside agency action found to be, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A) & (C). A court's function in reviewing regulations promulgated under the Magnuson-Stevens Act is to determine whether the Secretary has "considered the relevant factors and articulated a rational connection between the facts found and the choice made" and to reverse agency action if

ORDER – 6

it is arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. Yakutat, 407 F.3d at 1066. "This standard of review is 'highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision.'" Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric., 499 F.3d 1108, 1115 (9th Cir. 2007) (quoting Indep. Acceptance Co. v. California, 204 F.3d 1247, 1251 (9th Cir. 2000)). Judicial review is generally limited to the administrative record before the Secretary. Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv., 450 F.3d 930, 943 (9th Cir. 2006); Lands Council v. Powell, 379 F.3d 738, 748 (9th Cir. 2004). It is appropriate to decide the legal question of whether an agency regulation violates the APA on summary judgment. Hawaii Longline Ass'n v. NMFS, 281 F. Supp. 2d 1, 22 (D.C. Cir. 2003).

In reviewing this type of regulation, the Court applies the two-step test articulated in Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984). First, the Court must inquire whether Congress has spoken to the precise question at issue. If it has, the Court must give effect to the unambiguously expressed intent of Congress. Id. The Court may look to the statute's language, history, and purpose, and may apply canons of statutory construction in ascertaining whether Congress has spoken directly and unambiguously to a particular issue. Id. at 843 n.9; Maine Ass'n of Interdependent Neighborhoods v. Comm'r, Maine Dep't of Human Servs., 946 F.2d 4, 6 (1st Cir. 1991). If the statute is ambiguous, the Court must determine whether the agency's interpretation of the statute is permissible. Chevron, 467 U.S. at 843. The Court must give deference to agency's interpretation unless arbitrary, capricious, or manifestly contrary to statute. Id. at 844. A regulation is arbitrary or capricious if it conflicts with the statute or if the "agency has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of the agency's expertise." Yakutat, 407 F.3d at 1067.

ORDER – 7

**II.     Chevron Step One — Is the Statute Unambiguous?**

Both parties contend that the statute is unambiguous and supports its position.

**A.     Plain Language**

As mentioned, the statute limits eligibility in the non-AFA trawl catcher processor subsector to:

> the <u>owner</u> of <u>each trawl catcher processor</u> —
>
> (A) <u>that</u> is not an AFA trawl catcher processor;
> (B) <u>to whom</u> a valid LLP license that is endorsed for Bering Sea or Aleutian Islands trawl catcher processor fishing activity has been issued; and
> (C) <u>that</u> the Secretary determines has harvested with trawl gear and processed not less than a total of 150 metric tons of non-pollock groundfish during the period January 1, 1997 through December 31, 2002.

Pub. L. 108-447, § 219(a)(7) (emphasis added). Plaintiff argues that an <u>owner</u> who satisfies all three criteria qualifies for participation in the fishery and contends that the Secretary ignores the statute's focus on <u>owners</u>. Defendant argues that this section includes both an owner and a vessel requirement for participation in the non-AFA trawl catcher processor subsector, and that those requirements define and restrict the <u>vessels</u> that can be used to fish in the non-AFA trawl catcher processor subsector.

Contrary to both parties' suggestions, the plain language of § 219 does not address whether Congress authorized replacement vessels or whether otherwise qualified owners are limited to using the vessel that qualified them for the fishery. Although the first sentence of the provision focuses on owners, the subsections limit the universe of qualifying vessels. What is missing from the language is any indication of whether Congress intended otherwise qualified owners to be limited to using the vessels that qualified them for the subsector. The plain language is silent on this issue. Likewise, the language is silent regarding what Congress intended regarding replacement vessels.

**B.     Purpose / Legislative History**

The purposes behind the Capacity Reduction Program do not make Congress' words any more clear. Congress intended to promote the sustainability of the fishery by reducing the number

ORDER – 8

of vessels in the fishery. 150 Cong. Rec. at 11747. By reducing excess harvesting capacity, Congress hoped to "contribute to future rationalization and long term stability of these fisheries" and "contribute to the long term economic viability of the many businesses and people involved in the harvesting, processing and delivery" of fish. Id.

Plaintiff argues that its construction — under which an otherwise qualified owner can continue to participate in the fishery with a vessel other than the one that qualified the owner for the fishery — is consistent with Congress' intent to conserve fishery resources by restricting participation in the fishery. Plaintiff points out that under Defendant's construction, the BSAI fishery will eventually be eliminated because no boats will be viable — eventually all of the boats will need to be replaced. Plaintiff argues that substituting a single vessel does not expand the subsector, but keeps it at the reduced-capacity level that Congress determined to be desirable.

Defendant points out that the Capacity Reduction Program was intended to reduce capacity by reducing the number of vessels and licenses. See Pub. L. 108-447, § 219(b)–(e) (authorizing vessel/license buyback program). Allowing new vessels into the fishery would frustrate that purpose. Defendant argues that under Plaintiff's reading, and contrary to the intent of the statute, an owner who qualifies with one vessel could use multiple vessels in the fishery. The parties dispute whether owners would have an incentive to fish with multiple vessels.

Congress did not intend to eliminate the fishery, the logical result of Defendant's reading of the statute. But Congress also intended to reduce the number of vessels in the fishery through the vessel buyback program. It is not clear that Congress intended, however, to achieve reduction of the number of vessels by the means advocated by Defendant — that is, through the breaking-down and sinking of the fleet.

### C. Statutory Construction / Context

The parties dispute whether application of the "last antecedent" doctrine sheds light on Congress' words. Black's Law Dictionary defines the "last antecedent rule" as "[a] canon of statutory construction that relative or qualifying words or phrases are to be applied to the words or phrases immediately preceding, and as not extending to or including other words, phrases, or

ORDER – 9

clauses more remote, unless such extension or inclusion is clearly required by the intent and meaning of the context, or disclosed by an examination of the entire act." Black's Law Dictionary 882 (6th ed. 1990). Application of this doctrine here would suggest that all of the subparts in section 219(a)(7) modify "trawl catcher processor." That makes no sense. Section 219(a)(7)(B) clearly refers to owners because it uses the relative pronoun "whom." And applying the doctrine to subsections (A) and (C) does not answer the question at hand. Even if subsections (A) and (C) constitute vessel requirements, they are still silent regarding whether an owner must use <u>that particular vessel</u> and/or whether the owner can substitute a different vessel. Application of the doctrine does not make clear, as Defendant suggests, that because (A) and (C) are "vessel-oriented requirements," an owner who satisfies (A) and (B) is limited to participating in the fishery only with the qualifying vessel that satisfies subpart (C).

The parties also point to other provisions, both in section 219 and in the American Fisheries Act, and argue that Congress' previous limitation of membership in various subsectors to vessels or owners makes the language here more clear. For example, both parties point to section 208(g) of the American Fisheries Act, which limits eligibility in certain fisheries to particular <u>listed</u> vessels and also includes an explicit vessel replacement provision. <u>See</u> 16 U.S.C. § 1851 note, § 208(a)-(e), (g). In turn, the Capacity Reduction Plan defines the "AFA trawl catcher processor subsector" to mean the "<u>owners</u> of each catcher/processor listed ... in section 208(e) of the American Fisheries Act." Pub. L. 108-447, § 219(a)(1). The eligibility criteria in § 219(a)(1) for the AFA trawl catcher processor subsector is very similar to that in § 219(a)(7) for the non-AFA trawl catcher processor subsector — they both limit eligibility to owners of certain vessels. The difference, of course, is that, in a separate statute, Congress explicitly mandated that certain specific vessels be used in the AFA fisheries, but did not do the same in § 219(a)(7). <u>Compare</u> 16 U.S.C. § 1851 note, § 208(a)-(e) <u>with</u> Pub. L. 108-447, § 219.

"Where Congress knows how to say something but chooses not to, its silence is controlling." <u>In re Griffith</u>, 206 F.3d 1389, 1394 (11th Cir. 2000). This maxim cuts both ways here. On the one hand, Congress included a replacement vessel provision for the AFA fisheries

ORDER – 10

and not for the non-AFA fishery — the Court could read into that omission an intent <u>not</u> to allow replacement vessels in the non-AFA fishery. On the other hand, AFA § 208 makes clear that only certain vessels may be used in the AFA fishery. Section 219(a)(7) does not contain such limiting language — the Court could read into Congress' choice not to list specific vessels in section 219(a)(7) an intent not to limit participation in the fishery to any particular vessels. Moreover, it makes sense that Congress would include a replacement vessel provision in section 208, where it had limited participation to certain vessels, and not in section 219(a)(7), where it arguably did not limit participation to particular vessels. Because Congress' silence serves both parties' positions, it is not particularly illuminating.

The other contextual references are even less helpful. For example, Congress provided that eligibility for the longline catcher processors and pot catcher processors would be limited to certain license holders. Pub. L. 108-447, § 219(a)(6), (9). Defendant suggests that because Congress created eligibility criteria for those processors that are clearly owner/license-based, that Congress could not have intended to create an owner/license-based definition for the non-AFA trawl catcher processor subsector. But Plaintiff is not suggesting that the criteria for the non-AFA trawl catcher processor subsector only relate to owners and licenses. Plaintiff agrees that Congress intended to make prior catch history of the owner's vessel part of the eligibility criteria.

In sum, considering the plain language, legislative intent, context, and statutory construction, the Court concludes that the statutory language is ambiguous. The statute is not clear regarding whether Congress intended that otherwise qualified owners would have to use the vessel that qualified the owner for the fishery. The statute also is silent regarding whether a replacement vessel provision is authorized.

**III.    Chevron Step Two — Has the Agency Promulgated a Permissible Regulation Supported by a Rational Basis?**

Plaintiff argues that the Court should not give deference to and should find invalid Amendment 80 for two reasons: (1) because the Secretary failed to provide a rational basis for the lack of a replacement vessel provision in the rule, and (2) because Amendment 80 is impermissible

ORDER – 11

in that the Council and NMFS imposed an additional eligibility requirement for entrance into the Amendment 80 sector than that imposed by Congress.

In Plaintiff's comments on the Proposed Rule, Plaintiff complained that NMFS incorrectly interpreted the Capacity Reduction Program as limiting the vessels that can participate in the fishery and that NMFS inappropriately excluded a replacement vessel provision. 72 Fed. Reg. at 52,689. In response, the Secretary pointed to the language of the statute and to NOAA counsel's interpretation of the statute in concluding that the qualifying vessel — and no other — must be used in the fishery and that no replacement vessel was authorized. Id. In terms of NOAA counsel's advice, NOAA counsel applied traditional tools of statutory construction and interpreted the statute to mean that eligible persons are "those persons who, at the time of participation in the sector or the Capacity Reduction Program, own a trawl catcher processor that meets the statutory criteria at sections 219(a)(7)(A) and (C), and who has [sic] been issued a valid LLP license is [sic] endorsed for Bering Sea or Aleutian Islands trawl catcher processor fishing activity for the trawl catcher processor that meets the criteria in sections 219(a)(7)(A) and (C)." (AR 134a, at 7.) NOAA counsel also explained that "[t]he criteria for trawl catcher processors at sections 219(a)(7)(A) and (C) will qualify a finite number of vessels for this catcher processor subsector." (Id.) NOAA counsel did not directly address whether a replacement vessel provision was warranted or authorized. In explaining its interpretation of the statute and its rejection of a replacement vessel provision, the agency relied on NOAA counsel's letter, explained that Congress had not explicitly provided a replacement vessel provision, and stated that the agency could not adjust the specific statutory criteria for participation in the fishery. 72 Fed. Reg. at 52,689. NMFS also explained that a preliminary environmental assessment that had suggested that replacement vessels would be authorized was misleading and had been changed in the final version. Id.

The agency's explanation for interpreting the statute the way that it did is not well-reasoned. As the Court explained above, the statutory language is not clear on these issues — it is silent regarding whether a replacement vessel is authorized and it is silent regarding whether an

ORDER – 12

otherwise qualified owner must use the vessel that qualified that owner for the fishery. Indeed, the very reason NOAA counsel provided the advisory letter was because the Council acknowledged that the statute was not clear regarding eligibility criteria.[1] (See AR 134a.) NMFS pointed to no reason other than the language of the Capacity Reduction Program (and NOAA counsel's letter, which relied on the statutory language) to support its interpretation and the language does not say what the agency claims it says. Because the language does not support the agency's interpretation, the agency has not provided a reasonable basis for its decision.

Plaintiff also argues that it was irrational for NMFS to list the ARCTIC ROSE as an Amendment 80 vessel when the agency knew that it had sunk and not been recovered. But listing the ARCTIC ROSE makes sense in light of the fact that under the regulations, owners of lost vessels may continue to participate in the _cooperative_ fishery. See 50 C.F.R. 679.90(a)(2)(ii), 679.91(b). Amendment 80 permits owners who have lost their eligible vessels to use their Amendment 80 quota share (obtained through the catch history of the Amendment 80 vessel) to join a cooperative, thereby receiving benefits from their quota share while also furthering the bycatch and waste reduction goals. Id. Thus, it is not arbitrary that NMFS listed the lost ARCTIC ROSE in the regulations — Arctic Sole may continue to use the historic catch of the ARCTIC ROSE to qualify it to participate in the cooperative.[2]

---

[1] Among others, the Council posed the following question to NOAA counsel:

Section 219 generally defines each sector as being composed of the person who owns a vessel or holds a license or both. Given this wording, the Act is unclear concerning eligibility to participate in the buyback or the non-pollock fisheries.

    a.   Does the act authorize entry to the fishery by:
    i.   Specific persons?
    ii.  Specific vessels?
    iii. Holders of specific licenses?

(AR 134a, at 5.)

[2] Whether Plaintiff will be in a disadvantaged negotiating position in joining a cooperative is outside the appropriate analysis.

ORDER – 13

In addition to the fact that it failed to provide a good reason for its decision, NMFS' interpretation of the Capacity Reduction Program is impermissible in light of the language of and the purposes behind the statute. First, NMFS has added an eligibility criteria that Congress did not intend, something it is not allowed to do. See Iglesias v. United States, 848 F.2d 362, 366 (2d Cir. 1988) ("A regulation . . . may not serve to amend a statute . . . or to add to the statute something which is not there.") (internal citations and quotation marks omitted). The agency has read into the statute a requirement that otherwise qualified owners must use the vessel that qualified them for the fishery. As mentioned above, Congress did not impose that requirement. In addition, NMFS' interpretation impermissibly ignores the word "owner" in the first sentence of § 219(a)(7), which provides that owners of certain trawl catcher processors and with a certain license qualify for the fishery. Pub. L. 108-447, § 219(a)(7). NMFS' interpretation ignores Congress' focus on owners and turns what was a owner-based eligibility criteria into a vessel-based criteria.[3]

Second, an interpretation of the Capacity Reduction Program that limits eligibility to certain vessels but does not include a vessel replacement provision leads to absurd results — the inevitable elimination of the fishery. NMFS acknowledges that lack of "replacement vessel language could have been a legislative oversight" (Def.'s Reply at 9) and that "without a vessel replacement provision, the non-AFA trawl catcher processor subsector may have no eligible vessels with which to fish the sector's allocation" because eventually every eligible participant will find his or her self in Plaintiff's position. (Def.'s X-Motion/Resp. at 20.) This is not the goal that Congress intended. Nothing in the language or the legislative history of the statute suggests that Congress hoped to eventually eliminate the fishery by preventing otherwise qualified owners from replacing their vessels. To the contrary, the Capacity Reduction Program was passed to sustain

---

[3] The Court does not mean to imply that Congress was not also focused on vessels. Congress limited the universe of owners able to participate in the fishery by limiting eligibility to individuals who own vessels with a particular catch history and who have a particular license. Unlike in section 208 of the American Fisheries Act, however, there is nothing in the Capacity Reduction Plan that indicates Congress was concerned with which particular vessels are used in the fishery.

ORDER – 14

the fishery. See Pub. L. 108-447, § 219(g) ("[T]he Council should . . . take actions that promote stability of these fisheries consistent with the goals of this section and the purposes and policies of the Magnuson-Stevens Fishery Conservation and Management Act."); see also 16 U.S.C. § 1851(a)(8) ("Conservation and management measures shall . . . take into account the importance of fishery resources to fishing communities . . . in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities."); 150 Cong. Rec. at 11747 ("Reducing capacity in these fisheries will improve the ability of the [Council] to manage the groundfish stock and contribute to the long term economic viability of the many businesses and people involved in the harvesting, processing and delivery of the highest quality seafood products to consumers.").

The Capacity Reduction Plan was, as Defendant points out, intended to reduce capacity (i.e., the number of vessels and licences) in the fishery to reduce bycatch. To that end, it does not appear that Congress intended to allow qualified owners to fish with multiple vessels — that would run contrary to the capacity-reduction goal.[4] But capacity reduction does not mean capacity elimination, which is the undeniable result of NMFS' interpretation. Equally important, nothing in the language or legislative history suggests that Congress intended to reach its goals in the way suggested by NMFS. Congress intended to reduce capacity by instituting a vessel buyback program. See Pub. L. 108-447, § 219(b). Congress did not intend to reduce capacity by preventing owners whose vessels have sunk from replacing those boats.

The Court concludes that NMFS' interpretation — that an otherwise qualified owner must use the qualifying vessel and cannot substitute a replacement vessel — is impermissible in light of the statutory language and purpose and is not supported by a rational basis. The Court does not come to this conclusion lightly and takes seriously its responsibility to give deference to an agency's reasonable interpretation of a statute. But here, NMFS has promulgated an unreasonable interpretation that is out of line with what Congress intended to accomplish through

---

[4] Thus, a regulation that allowed an otherwise qualified owner to replace his or her Amendment 80 vessel with multiple vessels would also be impermissible.

ORDER – 15

the Capacity Reduction Program. Congress intended to limit capacity in the fishery to reduce bycatch. It intended to limit the number of vessels and licenses in this particular fishery. Congress did not intend to eliminate the fishery or to limit it through the sinking of the fleet. Because NMFS did not provide a good reason for its interpretation and because the interpretation is impermissible, the Court concludes that the regulation is arbitrary and capricious. To the extent Amendment 80 restricts access to the BSAI non-pollock groundfish fishery to qualifying vessels without allowing a qualified owner to replace a vessel that has sunk, the regulations are invalid and are hereby vacated.

**Conclusion**

The Court GRANTS Arctic Sole's motion for summary judgment and DENIES Defendant's cross-motion for summary judgment. To the extent that it restricts access to the BSAI non-pollock groundfish fishery to qualifying vessels without allowing a qualified owner to replace a lost qualifying vessel with a single substitute vessel, the regulations must be set aside because they are arbitrary, capricious, and otherwise not in accordance with law. The Amendment 80 regulations shall be vacated and remanded to NMFS to the extent they have been found unreasonable. See County of Los Angeles v. Shalala, 192 F.3d 1005, 1011 (D.C. Cir. 1999); Hawaii Longline, 281 F. Supp. 2d at 38 (vacating and remanding regulations found to be arbitrary and capricious).

The clerk is directed to send a copy of this order to all counsel of record.

Dated: May 19th, 2008.

*/s/ Marsha J. Pechman*

Marsha J. Pechman
United States District Judge

ORDER – 16